**UNITED STATES of America,**
**Plaintiff,**

v.

**Roy Hayden BROWN, Jr., Defendant.**

**No. 71 CR 106.**

United States District Court,
N. D. Illinois, E. D.

Feb. 4, 1972.

Ted Scudder, Asst. U. S. Atty., Chicago, Ill., for plaintiff.

Kenneth Jacobs, Villa Park, Ill., for defendant.

## MEMORANDUM OPINION

*Motion For Judgment of Acquittal*

MAROVITZ, District Judge.

Roy Hayden Brown, Jr. came before this Court for trial under Indictment No. 71 CR 106 charging him with failing to proceed to his civilian work assignment in lieu of Military Service, in violation of 50 App. U.S.C. § 462. We are now prepared to rule on the points raised in Defendant's Motion For Acquittal.

A short chronology of Defendant's Selective Service record is necessary in order to better understand his present position.

Defendant registered with his local draft board in December of 1966 after having reached the age of 18. In his questionnaire dated January 10, 1967 he indicated under "Occupation" that he was a lithographer working an average of 30 hours per week. He also indicated in Section VII of that same questionnaire that he was a minister of Jehovah's Witnesses though not formally ordained as such. As to the section dealing with conscientious objection, he wrote in "Does not apply". He was classified I–A. In a letter dated April 18, 1968 he wrote that his beliefs prevented him from participating in "any form or fashion" in military service and that he devoted a "large part" of his time to his religious activities. He subsequently filled out a Conscientious Objector Form dated April 22, 1968 wherein he detailed the reasons and origin of his beliefs. Among the comments made is:

"I am presently a congregation publisher. I have served as a vacation pioneer, regular pioneer, Bible Study Servant, and Assistant Ministry School Servant. My activities include extensive study, Bible presentations, field ministry, teaching home Bible studies, and attending five meetings weekly."

In addition, under "General Background" he indicated that he had been employed as a linotype operator from 1965 to the date the Form was filed.

On May 20, 1968 he was reclassified I–A by the Local Board, a classification which he appealed. The Appeal Board reclassified him as a Conscientious Objector. Over the next year he was processed through the normal C–O channels and on January 6, 1970 he received notice to report to his Local Board on January 19, 1970 for instructions regarding his civilian work. After repeated efforts to come to an agreement as to a choice of civilian work, he was assigned to the Sherman Hospital in Elgin, Illinois. He failed to appear and was subsequently indicted.

The Defendant presents a multitude of reasons as the basis for his Motion of Acquittal. As to the following contentions suffice it to say that they are wholly without merit and we hereby deny the Motion as to them:

That the Government has failed to establish beyond a reasonable doubt every essential element of offense charged in the information;

That the Government has failed to establish and prove by competent evidence beyond a reasonable doubt the existence of the corpus delicti;

That the defendant was denied due process of law in that he was denied the right to be represented by legal counsel of his own choosing in all of the proceedings before the Selective Service Boards;

That the Government has failed to establish and prove by competent evidence beyond a reasonable doubt that the defendant, Roy Hayden Brown, Jr., did "knowingly and wilfully neglect, fail, and refuse to report to the Local Board Number 82" in violation of 50 App. U.S.C., Section 462, as charged in the Indictment.

That the defendant was denied his Sixth Amendment right to confront and cross-examine the witnesses against him;

That the Trial Court committed prejudicial error admitting the Selective Service file into evidence;

That a purported Civilian Work Order issued absent a formal declaration of war or national emergency by the United States Congress is in direct violation of the Thirteenth Amendment to the United States Constitution and, therefore, null and void.

Defendant does, however, present four contentions (the remainder of the grounds for the Motion not already denied are related to these issues) which warrant discussion. He argues that he presented a *prima facie* claim for ministerial status evidenced by the totality of his file and that there was no basis in fact for the denial of the status; that both the Local Board's and the Appeal Board's failure to state reasons for the denial of ministerial status was a denial of due process; that the Boards breached their duty to properly review Defendant's file given what appears to be the short amount of time spent on each file; and finally, that Defendant's Civilian Work Order was invalid since his random selection number was called out of sequence.

## I.

The Military Selective Service Act 50 U.S.C. § 456(g) provides that "regular or duly ordained ministers . . . shall be exempt from training and service . . .". The Defendant, who indicated that he is not ordained, must therefore seek ministerial status as a "regular" minister. The definitional portion of the Selective Service Act, 50 U.S.C. § 466(g) (2) provides that:

"The term 'regular minister of religion' means one who as his customary vocation preaches and teaches the principles of religion of a church, a religious sect, or organization of which he is a member, without having been formally ordained is a minister of religion, and who is recognized by such church, sect, or organization as a regular minister."

Furthermore, the ministry must be one's vocation rather than avocation as defined in 50 U.S.C. § 466(g) (3):

"The term 'regular or duly ordained minister of religion' does not include a person who irregularly or incidentally preaches and teaches the principles of religion of a church, religious sect, or organization and does not include any person who may have been duly ordained a minister in accordance with the ceremonial, rite, or discipline of a church, religious sect or organization but who does not regularly, as a vocation, teach and preach the principles of religion and administer the ordinances of public worship as embodied in the creed or principles of his church, sect, or organization."

The application of these provisions has always presented a particular problem in regard to members of Jehovah's Witnesses because the position of "minister" must be interpreted with due regard to its unique function in the milieu of that sect. In the broad sense of the word every baptized member of Jehovah's Witnesses is considered a "minister" in keeping with the doctrine of the "priesthood of all believers" and to treat a claim for ministerial exemption in the conventional sense of that term without inquiring into its particular use in the context of Jehovah's Witnesses would be to automatically exempt all members of the sect on the simple proof of membership. In addition, even using "minister" in the conventional sense Jehovah's Witnesses congregations usually have more than one individual who is considered a minister. Another difficulty prevalent in these cases though by no means limited to Jehovah's Witnesses alone, is the not uncommon practice of its members to work in secular occupations while at the same time engaging in religious pursuits. The vocation-avocation differentiation of 50 U.S.C. § 466(g) (3) thus becomes all the more difficult of ascertainment given the intertwinement of both secular and religious pursuits.

In order to determine a valid ministerial exemption for a member of Jehovah's Witnesses, two primary interrelated factors are generally taken into

consideration: 1) The member's relative position in the organizational hierarchy of the sect and 2) the ratio in terms of time between the member's religious work and secular work. The higher one's position in the congregation and the lower the number of hours spent in secular work the more likely he is to be granted ministerial exemption. The lower one's position in the congregation and the greater the prominence of his secular work the more likely that he is a "member" of the congregation rather than a "minister".

Countless combinations of these two variables can obviously occur if the factors on either side are juggled. (See 1 A.L.R. Fed. 607 for a comprehensive article on the subject.) This equation, however, is by no means irrebuttable or absolute but it does cover the more obvious, clear-cut situations at either end of the spectrum. The first half of the equation, the structure of the congregation, must initially be mapped out in order to determine Defendant's position on that map. The Court in United States v. Tettenburn, 186 F.Supp. 203 (D.Md. 1960) clearly set out the congregational structure of Jehovah's Witnesses at 207, 208:

"Each congregation is headed by a Congregation Servant who is the presiding minister and overseer of all congregation activities. Under the Congregation Servant there are as many as seven Servants in Congregation. It is most important that the title 'Servant in Congregation' be distinguished from 'Congregation Servant'. There is but one Congregation Servant and he is the presiding minister. Among the Servants in Congregation are an Assistant Congregation Servant who takes oversight of the congregation in the absence of the Congregation Servant, and a Bible Study Servant who supervises the Bible study work and back-call activity of the congregation. The Congregation Servant, Assistant Congregation Servant, and Bible Study Servant comprise what is known as the Congrega-

tion Committee. This Committee makes recommendations as to the appointment of Servants and is active in fiscal and other matters. There are other Servants in Congregation; and in smaller congregations, one person may hold more than one position.

"Each congregation contains a number of Pioneer ministers, some of whom may hold positions as a Servant in Congregation. . . . The Pioneer works under the supervision of the Congregation Servant but is appointed by and required to submit monthly reports to the international office in Brooklyn. *He must devote an average of 100 hours a month to ministerial activities in the field. In computing his 100 hours per month he is not allowed to count time spent in reading or preparation for field work.* (Emphasis in original.) Vacation Pioneers are appointed for a two-week to three-month period and are not regarded as regularly appointed, full Pioneers.

In addition to the Servants in Congregation, and the Pioneers, there are Book Study Conductors who with the aid of the Society's bound books preside over study groups engaged in Bible study. . . . A Book Study Conductor need not be, and usually is not, a Pioneer minister and, therefore, has no minimum requirement as to hours he devotes to religious work. *The title of Book Study Conductor is the lowest title given in a local congregation, all other members being known as Publishers.* (Emphasis in original.) Servants in Congregation, Pioneers, and Book Study Conductors are sometimes referred to by the Society as 'Assistant Presiding Ministers.' This is on the theory that each one is of some assistance to the Congregation Servant, but the designation 'Assistant Presiding Minister' must be distinguished from 'Assistant Congregation Servant', since there is only one 'Assistant Congregation Servant' but an average of more than ten 'As-

sistant Presiding Ministers' in a local Congregation."

Over the years there has been much discussion as to what the lowest status within the congregation to be allowed a ministerial exemption ought to be. See Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953) (Company Servant, 100 hours per month in missionary work, 20 hours per month in secular work.); U. S. ex rel. Kulick v. Kennedy, 157 F.2d 811 (2nd Cir. 1946) (Pioneer); United States v. Hurt, 244 F.2d 46 (3rd Cir. 1957) (Pioneer and Company Servant); United States v. Ransom, 223 F.2d 15 (7th Cir. 1955) (Pioneer and Assistant Company Servant); Hacker v. United States, 215 F.2d 575 (9th Cir. 1954) (Pioneer); United States v. Kidson, 315 F.Supp. 132 (D.N.H.1970) (Servant in Congregation and Assistant Presiding Minister).

In a recent case in our Circuit the Court in United States v. Hawver, 437 F.2d 850 (1970) held:

"It is clear that the board proceeded on the premise that a Jehovah's Witness must be at least a regular pioneer minister in good standing before his claim that he is a 'regular or duly ordained minister of religion' can be granted. Accepting that premise, the question is whether the August 9 certificate, coupled with appellant's failure to obtain a certificate that he continued in good standing as a regular pioneer minister, provided a basis in fact for rejecting appellant's repeated assertions that he was a pioneer minister, documented by the June 10 letter of appointment.

. . . . . .

"The further question is whether status as a pioneer minister (or higher) is essential to the grant of IV–D to a Jehovah's Witness who otherwise makes a prima facie case that his religious preaching and teaching activity is his customary and regular vocation. Although the view that a Jehovah's Witness pioneer minister is equivalent to a minister for the purpose of the exemption is widely used as a rule of thumb, we conclude that, under the statute, the converse is not universally true.

"The statutory definitions of 'duly ordained minister of religion' and of 'regular minister of religion' are found in 50 App. U.S.C.A. § 456(g). Dickinson v. United States involved a Jehovah's Witness who was a pioneer minister, as well as a company servant for a particular congregation or company, but the Supreme Court characterized as the 'vital test' whether he was 'regularly, as a vocation, teaching and preaching the principles of his sect and conducting public worship in the tradition of his religion.'

"Several courts have held that being a pioneer minister is not necessary in order to fulfill the test. Each of these cases involved a Jehovah's Witness who held a lesser title than regular pioneer minister, but who appeared, prima facie, to make religious teaching and preaching his regular and customary vocation. In each case, the court held unlawful the board's denial of a IV–D classification solely on the basis that the registrant was not a regular pioneer minister. [United States v. Tichenor (6th Cir., 1968), 403 F.2d 986; Book Study Conductor devoting 27½ hours per week to his ministry; United States v. Hestad (W.D.Wis., 1965), 248 F.Supp. 650: Vacation Pioneer, 200 hours per month; United States v. Dillon (D.Or., 1968), 294 F.Supp. 38: Vacation Pioneer, 130 hours per month; United States v. Kidson (D.N.H., 1970), 315 F.Supp. 132: Ministry School Servant, 150 hours per month]. It has been held in a case involving a different faith that the board must not rely on a particular title, but must consider whether the registrant's activity fulfills the 'vital test' of *Dickinson.*

In 1958 the fifth circuit held that a Jehovah's Witness book study conductor had made out a prima facie case for exemption. In later cases, however, the fifth circuit has, in upholding a board's denial of IV–D classification to a Jehovah's Witness, placed considerable emphasis upon the fact that the registrant

was not a pioneer minister. In McCoy v. United States, [403 F.2d 896 (5th Cir. 1968] and in Robertson v. United States, [417 F.2d 440 (5th Cir. 1969)] the court upheld denials, and gave weight to the statement of the general counsel for the Watchtower Society that the Society would not contend for a IV–D classification except for those who are pioneers or congregation servants (not pioneers) who can show that they are devoting their time to the ministry work of Jehovah's Witnesses sufficiently to claim that it is their vocation rather than their avocation. We do not read either case, however, as squarely holding that if a Jehovah's Witness makes out a prima facie claim that his religious teaching and preaching activity is his regular and customary vocation, a board may validly deny him a IV–D classification solely on the ground that he does not hold the title of congregation servant or pioneer minister or higher. The opinion in *McCoy* lays some stress on the fact that the registrant, who was a vacation pioneer, was failing to spend enough time in his ministerial efforts to qualify as a pioneer. The principal opinion in *Robertson* points out, 417 F.2d at p. 446, 'It is contrary to the evidence of record, therefore, to say that Robertson's request for a ministerial exemption was denied solely due to the fact that he was only a Vacation Pioneer. Denial of the IV–D classification was based on all of the facts and circumstances which the board believed were insufficient to justify such a classification. . . . The evidence fell far short of substantiating a full-time ministry as a vocation for appellant.'

"In other decisions upholding denial of the IV–D classification to a Jehovah's Witness who was not a regular pioneer minister, courts have clearly avoided deciding that such a registrant could proply be denied the classification if he showed that his religious teaching and preaching activity was his customary and regular vocation. . . . "

It is therefore clear that the controversy centers around whether an individual lower than a "Pioneer" such as a "Vacation Pioneer" or "Book Study Conductor" ought to be allowed the ministerial exemption and whether the courts are willing to go all the way to the bottom of the titled hierarchy in the congregation rather than drawing the line at "Pioneer". Even the courts which have been willing to go below the "Pioneer" level have done so only a notch or two and only under the most extraordinary of circumstances such as where the individual spends huge amounts of time pursuing the ministry.

Yet none of the cited cases have recognized ministerial status for the position claimed by Defendant. In his letter of May 3, 1968, he stated:

"I am presently a *congregation publisher* . . . My activities include extensive study, Bible presentations, field ministry, teaching home Bible Studies, and attending five meetings weekly." (Emphasis added.)

As indicated earlier "the title of Book Study Conductor is the lowest title given in a local congregation, *all other members being known as Publishers*" 186 F. Supp. 203 at 208. (Emphasis added.) Defendant's claim that he is a congregation publisher is simply a claim that he is a member of a Jehovah's Witnesses Congregation and his status therefore falls far below that of any individual previously granted an exemption based on his position in the congregation. Thus based on the first part of the equation, position in the congregation, Defendant has failed to make out a prima facie case for exemption. This very fatal defect in his claim ought to be sufficient in and of itself to preclude any possibility of ministerial status and impossible of cure even by a compensating number of hours pursued in the ministry.

We, nevertheless, will now turn to the second half of the equation, the ratio between his secular and religious work. In all of the cases cited it was abundantly *demonstrated* by the individual that he spent numerous hours in his religious work, either the "100 hours per month" of Pioneer status or some other sub-

stantial number of hours. *Dickinson, supra* (100 hours per month); *Ransom, supra* (100 hours per month); United States v. Rossi, 143 F.Supp. 878 (D. Mich., 1956) (160 hours per month). Even in the *Kidson* case relied on by Defendant where the individual spent 40 hours per week in secular work he clearly demonstrated that he devoted 150 hours per month to his religious duties. (In addition he was a "Servant in Congregation," a position considerably higher than Defendant's in this case.) Nowhere in Defendant's communications to his Local Board was he specific about the number of hours he spent in his religious work. He claims that his religion is an "integral part of my life" (File, A–35); that he devotes "a large part of my life to the ministry." (File A–26); that "My activities include *extensive* personal study. . . . ." (File A–27). But there is no additional information anywhere in the file regarding what the ratio of his religious work is to his secular work.

In United States v. Kushmer, 365 F.2d 153 (7th Cir., 1968) the issue presented was almost identical to the one before us now; whether the Defendant had made a *prima facie* showing of ministerial exemption. The defendant in *Kushmer* indicated that he was a "Book Study Conductor" and a "Literature Servant" and that he spent 30 hours a week in secular work and around 80 hours a month to his ministry. The Local Board affirmed his I–O classification and the Appeal Board made a similar *de novo* classification. His ministerial exemption was denied. The court upheld the classification stating:

"The issue presented is whether the defendant made a prima facie showing of eligibility for a ministerial exemption, a IV–D classification to his local selective service board, and if so, whether the local board's classification was arbitrary and capricious and without a basis in fact.

\*　　\*　　\*　　\*　　\*　　\*

"On March 27, 1962 the local board classified the defendant for the first time. He was classified I–O, conscientious objector.

"The defendant subsequently filed a notice of appeal and requested a personal appearance. He appeared before the board in May 1962. The defendant stated that he had previously been a Pioneer Minister but was now engaged in secular employment for about thirty hours a week and was able to devote only around eighty hours a month to his ministry. He stated that he was one of eight assistant ministers and that there was no presiding minister in his congregation. The defendant said that a Jehovah's Witness congregation consists of from 100 to 150 persons; that he presided over a 'Service Center' of about twenty persons. He stated that he devoted the better part of Wednesday, Saturday, and Sunday mornings and Tuesday, Wednesday, and Fridays evenings to his ministry. The local board affirmed its I–O classification, and a similar de novo classification was made by the appeal board on August 24, 1962.

\*　　\*　　\*　　\*　　\*　　\*

"A selective service registrant has the burden of establishing his eligibility for the exemption claimed. Dickinson v. United States, 346 U.S. 389, 395, 74 S.Ct. 152, 98 L.Ed. 132, 137 (1953); United States v. Hill, 221 F.2d 437, 440 (7th Cir), cert. denied, 349 U.S. 964, 75 S.Ct. 897, 99 L.Ed. 1286 (1955). Under the statutory provisions granting exemptions to 'regular . . . ministers of religion' the defendant was required to show that the ministry was his 'customary vocation. 50 USC App §§ 456(g), 466(g). He was required to demonstrate that he was not merely a person who 'incidentally preaches and teaches' the religious principles of a church or sect, but that he is 'recognized by such church, sect, or organization as a regular minister.' We are of the opinion that the defendant failed to carry his burden and that therefore it is not necessary to consider whether there is any basis in fact for the classification

of the local board. He failed to show that the ministry was his 'customary vocation' or that the Watchtower Bible and Tract Society recognized him as a 'regular minister.'

"The defendant's sincere religious convictions are undoubted. He has in the past devoted considerable time and effort to the work of his church. But the defendant's activities on behalf of the Jehovah's Witnesses, once measured at over 200 hours per month, have been reduced to the point where his own church has withdrawn its earlier recognition of him as a Pioneer Minister. The financial hardship which may have precipitated the defendant's diminished service is unfortunate, but it does not negate the fact that the ministry is not his customary vocation. The facts do not establish his eligibility for the exemption claimed.

"With deference to the decisions of the Fifth Circuit cited by the defendant, we note that the interpretation of the ministerial exemption provision by this court has not been as relaxed, and, we think, is more in accord with the expressed congressional policy. Compare Wiggins v. United States, 261 F. 2d 113 (5th Cir, 1958), with United States v. Ransom, 223 F.2d 15 (7th Cir, 1955), United States v. Diercks, 223 F.2d 12 (7th Cir), and United States v. Hill, 221 F.2d 437 (7th Cir).

*Kushmer*, therefore, is strong precedent for finding that Defendant in our case did not present a *prima facie* case for ministerial exemption.

Defendants heavy reliance on Wiggins v. United States, 261 F.2d 113 (5th Cir. 1958) is misplaced in view of the pronouncement in *Kushmer* that the Seventh Circuit applies a stricter avocation-vocation standard than the Fifth Circuit. In addition, the Fifth Circuit itself seems to have moved away from the flexibility demonstrated in *Wiggins* to the more rigid standard reflected in McCoy v. United States, 403 F.2d 896 (5 Cir., 1968) (Vacation Pioneer denied exemption) and Robertson v. United States, 417 F.2d 440 (5 Cir., 1969) (Vacation Pioneer denied exemption).

Thus taking into consideration Defendant's low, non-titled status in the congregational structure, his vagueness and failure to indicate at any time how many hours he spent pursuing his ministry and finally applying that equation with the restraint prescribed by *Kushmer* we find that no *prima facie* case for ministerial exemption was presented to the Local Board; that Defendant failed to carry the burden of proof that was upon him and that he failed to rebut the presumption against the ministerial exemption. We might add here that there was more than an adequate basis in fact for the denial of the exemption clearly evidenced in the file. The implications of his file are that he is a lithographer with only an avocational interest in the ministry.

To summarize then, Defendant does not have recognized standing even by his own congregation as a minister to a congregation or leader of a group of lesser members of his faith; even if by some stretch of the facts he could be considered a minister in "name", he could not be considered a minister in "practice" since he never demonstrated that it was his vocation; no *prima facie* case for ministerial exemption was established and, moreover, the registrant's file is replete with indications that substantiate the Local Board's denial of that exemption.

The exemption was properly denied.

## II.

■ Defendant's argument that he was denied due process because of the Local Board's failure to list the reasons for their decision is likewise without merit. United States v. Lemmens, 430 F.2d 619 (7th Cir. 1970) limits the requirement to state reasons for a denial to those instances where a subjective determination must be made. A conscientious objector case may present such a situation. It is not required in cases of an objective determination such as the

one made regarding the ministerial status of Defendant. A Jehovah's Witness case is no more subjective than the usual ministerial exemption case that requires proof of pursuit of the ministry as a vocation and to find here that reasons must be stated in a denial would require reasons to be stated in all ministerial cases. In addition the Defendant's failure to muster even a *prima facie* claim to the exemption obviates any need for reasons stated.

### III.

■■ Defendant claims that both the Local and Appeal Board breached their duty to properly review his claim to ministerial exemption and bases this claim on evidence of a circumstantial sort. He claims that on the day that he was classified I–A the Local Board considered 134 reclassifications and one personal appearance in a two-hour span of time and that it, therefore, was physically impossible to give his file adequate consideration given the approximately fifty-two seconds allotted each file. We find that Defendant fails to present any evidence that due process was indeed denied him. The two cases cited by Defendant which did allow for "average time" as evidence of due process denial dealt with appeal boards rather than local boards. United States v. Wallen, 315 F.Supp. 459 (D. Minn.1970); Slettlehough v. Tarr, 4 SSLR 3106 (D.Minn.1971). There is a critical distinction between the type of case handled by a local board and that handled by an appeal board. A vast majority of local board cases are automatic or perfunctory reclassifications such as registrants who have passed their 35th birthday or students who have lost 2–S deferments by graduating. Thus, "time averaging" does not accurately reflect the actual amount of time spent on the more difficult cases. The Local Board might indeed dispose of 100 or more perfunctory cases in a very short time and spend the major part of its time on the more difficult cases. We are, therefore, not willing to apply the *Wallen* case to local board instances based on the simple averaging of time spent on each file absent more concrete evidence. See United States v. Hansen, 327 F.Supp. 1090 (D. Minn.1971); United States v. Young, 324 F.Supp. 69 (D.Minn.1970). In addition, Defendant argues that the Appeal Board's *de novo* review could not have cured the Local Board's denial of due process since the Appeal Board reviewed 94 cases in two and one-half hours on the day it dealt with his file. Thus the *average* of one minute and thirty-six seconds spent on each file is argued to be evidence of due process denial. We find the evidence in Defendant's case to be to the contrary. The Appeal Board *must* have closely scrutinized Defendant's file since it reversed the Local Board's classification from I–A to I–O conscientious objector status. It could not have done so without taking into consideration all of Defendant's letters and claims. It also, in passing judgment must have rejected his claims to ministerial status. We, therefore, find no merit in Defendant's motion based on denial of due process.

### IV.

■ Finally, Defendant argues that his Lottery Number was 026 and that the highest number "reached" by his Draft Board in the month of January 1970 was 007. Defendant therefore argues that he was called out of sequence and the Civilian Work Order issued was invalid.

Local Board Memorandum No. 97 II, F. provides that:

> "In all instances, registrants classified I–O shall be selected for civilian work exactly as if they were in Class I–A or I–A–O."

In addition Selective Service Regulation 32 C.F.R. 1660.20(a) indicates that:

> " . . . If the Local Board deems any one of these types of work to be appropriate, it will order the registrant to perform such work, but such order shall not be issued prior to the time that the registrant would have

been ordered to report for induction if he had not been classified in Class I–O, unless he had volunteered for such work."

The issue in our case then remains whether the issuance of the Defendant's Civilian Work Order violated these sequential requirements, the test being whether Defendant would have been called had he been classified I–A holding No. 26 rather than a I–O with that same number.

Defendant argues that in determining whether a I–O registrant may be called, the last I–A number "reached" must be referred to by examining the I–A order of the call list to see if a I–A registrant with the same or higher random sequence number has been ordered for induction, and a registrant with a I–O number can be called *only* if that I–A number reached is equal to or higher than his. Defendant thus contends that he was called out of order since No. 7 was the highest I–A number *called* for induction and that he could not be called before a I–A registrant with a number 26 or higher was first *called* for induction. This argument is totally devoid of any merit and would provide a I–O registrant with a vast advantage over any I–A registrant. Defendant's interpretation of the regulations implies that a conscientious objector's availability can only be triggered by the actual calling of a I–A registrant with the same or higher number even though the conscientious objector's number is next in sequence. Thus hypothetically, if a local draft board would have only three registrants, one registrant available in the I–A class with Lottery Number 7, one conscientious objector with the Number 26 and a third I–A registrant with a Number 350, according to Defendant's interpretation, the conscientious objector could not be called until the Number 350 was actually called for induction since a I–A regis-

trant with the Number 26 or higher had not been actually called until the Number 350 was reached. Obviously, that result would be ludicrous and incongruous. Granted that a I–O registrant ought not be prejudiced because of his classification but he certainly should not be placed in more advantageous position either.

The regulation simply means that the Local Board must look at the registrant's number without considering classification and a I–O should be treated precisely as I–A. In our case the Local Board was ordered to produce three registrants for active duty but it was not permitted to go above Lottery Number 30. The Board searched through Number 30 and found only two men available for military induction, one under the pre-1970 "order of call" and one with the Lottery Number 007. It needed one more registrant to deliver. It proceeded to search through its files and the only one available between Number 7 and Number 30 was the Defendant who held Number 26. Thus if Defendant had been classified I–A there is no doubt that he would have been next in sequence between Number 7 and Number 30 since there were no other registrants available with numbers between 007 and 26. If he could have been called as a I–A registrant then perforce he must be called as I–O. Defendant's interpretation of the regulations which would require the *actual* calling of a I–A number equal to or higher than the I–O number before the latter could be called is totally without logical or statutory basis and would in fact violate the regulations by giving a I–O holder a preferential and more advantageous position than a I–A holder. We therefore, hold that Defendant's number was "reached" and that he was called in proper order and the Civilian Work Order is valid.

Acquittal is denied.